Filed 4/4/23  Lab Zero v. Cartwright CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| LAB ZERO, INC., | B319561 |
| Cross-complainant and Respondent, | (Los Angeles County Super. Ct. No. 21STCV12297) |
| v. | |
| MARIEL CARTWRIGHT et al., | |
| Cross-defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Yolanda Orozco, Judge.  Reversed.

King & Siegel, Julian Burns King and Robert J. King for Cross-defendants and Appellants.

LEGALAXXIS, Nazgole Hashemi and Tannaz H. Hashemi for Cross-complainant and Respondent.

————————————

Plaintiffs Mariel Cartwright and Francesca Esquenazi (plaintiffs), former employees and board members of defendant Lab Zero, Inc., appeal from the denial of their special motions to strike pursuant to the anti-SLAPP statute,[1] Code of Civil Procedure section 425.16.[2]

Plaintiffs contend that four causes of action in Lab Zero's first amended cross-complaint arose from their speech in connection with a public issue—their alleged public and private statements accusing Lab Zero's sole shareholder Michael Zaimont of sexual harassment. As described below, we agree with plaintiffs that the challenged causes of action arise, at least in part, from their alleged statements about Zaimont's sexual harassment. We further agree with plaintiffs that those alleged statements were made in connection with a public issue.

We thus reverse and remand this matter to the trial court to determine whether Lab Zero has established that there is a probability it will prevail on the four challenged causes of action.

---

[1] "SLAPP" is an acronym for "so-called strategic lawsuits against public participation." (*FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 139 (*FilmOn*).)

[2] All subsequent undesignated statutory references are to the Code of Civil Procedure.

# FACTUAL AND PROCEDURAL BACKGROUND[3]

## I. Lab Zero and ensuing controversy

Plaintiffs and Zaimont worked at Lab Zero, a video game development company. Lab Zero is known for its development of two popular video games—Skullgirls and Indivisible.[4]

During the events at issue, Cartwright worked at Lab Zero as a lead animator and was a board member. Esquenazi was Lab Zero's chief executive officer and also a board member. Zaimont was a designer and programmer when the company was founded, and later became its president, a board member, and the sole shareholder. Zaimont created the proprietary technology Lab Zero used to design and build its video games.

---

[3]    The parties made over 400 evidentiary objections in the trial court in connection with plaintiffs' anti-SLAPP motions, involving over 1,400 pages of objections and responses. On appeal, neither party's brief complains that the other party's brief has cited inadmissible evidence. As a result, we assume the evidence cited by the parties in their briefs was admitted by the trial court or that the parties have forfeited their objections to such evidence for purposes of the present appeal.

[4]    Zaimont described Skullgirls as "a player-versus-player 'fighting' video game" that "features mild language and partial nudity" and art that "became popular and moderately controversial for its sexualized depiction of cartoon" women. According to Zaimont, Indivisible is "an 'action role-playing' video game" that was the subject of "moderate controversy because Lab Zero employed a popular pornographic artist" during the game's development and permitted the artist "to have an avatar with racy dialogue in one location in the game."

The events at issue began around June 2020, when two individuals in the video game community publicly accused Zaimont of making inappropriate comments to them. An online article dated June 29, 2020, reported that "[t]wo people have accused Mike Zaimont, a lead designer on *Skullgirls* and *Indivisible*, of making them uncomfortable with demeaning and sexually suggestive comments." One of the individuals was "Bunny," described by the article as a "popular Twitch[5] personality with over 1.5 million followers across her various social media pages." The article reported that Bunny had recently stated on Twitter that she would be "stepping away from the [fighting game] genre," and quoted her Twitter post explaining that a " 'big reason . . . is sexual harassment [she] received from a big creator . . . .' " According to the article, "[t]his morning, Bunny came forward . . . saying that her previous tweets were about Mike Zaimont, a veteran fighting game competitor and developer on *Skullgirls* and *Indivisible*." The article further reported that writer and video game tournament organizer Carbon Grey said in a video posted online, " 'I don't know what Mike said to [Bunny], but I'm sure it was shitty and I know that because Mike's been making weird, sexual comments at me . . . at fighting game events for actual years.' " The video apparently garnered more than 144,000 views. The next day, one online gaming community announced it had banned Zaimont from commenting on or participating in gaming events.

A declaration submitted by Zaimont in opposition to plaintiffs' special motions to strike stated the day after the media

---

[5] Twitch is a live-streaming service that focuses on streaming live video games, including e-sports competitions.

4

coverage, plaintiffs organized a staff meeting where Lab Zero employees were openly critical of him. Afterwards, plaintiffs created a Slack channel[6] for Lab Zero staff, except for Zaimont, to discuss their experiences with Zaimont. Employees discussed a range of issues on the Slack channel, including their complaints about Zaimont's inappropriate behavior and comments; whether they felt comfortable continuing to work with him; whether they wanted him to remain in a leadership role in the company; and the possibility of leaving Lab Zero and forming another company. Cartwright later claimed in support of her special motion to strike that Zaimont "frequently made unprompted, unwelcome, and inappropriate comments about [her] body, dress, and sexuality," and that she had spoken to him several years earlier "about his pattern of inappropriate behavior and explain[ed] that his comments were making [her] and the other employees extremely uncomfortable."

In early July 2020, plaintiffs met with Zaimont to discuss his behavior and to attempt reaching an agreement about him leaving Lab Zero and disbursing his equity in the company. Zaimont did not resign.

Instead, on August 17, 2020, Zaimont sent a memo to Lab Zero board members and employees stating, among other things, that he would not resign. Zaimont also stated that Lab Zero's situation was "obviously delicate," and asked everyone "to decide by the end of this month . . . if they would like to leave or continue on here to try and help us all build a safer and better Lab Zero."

---

[6]     Slack is an instant messaging platform.

## II.    Public resignations from Lab Zero

In late August 2020, several employees, including Cartwright, publicly announced their resignations from Lab Zero.

One artist posted his resignation letter on Twitter, stating, in part, that "I'm leaving Lab Zero Games.  Short version: [Zaimont] creates an unsafe work environment for everyone." The attached letter stated, among other things, that "[t]his is not a kneejerk reaction to singular recent incidents made public, but a whole retrospection and investigation among all employees at Lab Zero."

Another animator posted his resignation letter on Twitter, stating, "Hey guys, I've resigned from Lab Zero Games."  The resignation letter noted that after Zaimont's recent "public incident, the team began an internal investigation with all the employees, and soon realized that [Zaimont's] behavior wasn't just scattered incidents," but that "[a]lmost every employee has a story where [Zaimont] abused his position of power to put his coworkers in uncomfortable stressful situations for years," including "frequently mentioning his genitals, forcing unwanted physical contact, [and] making sexual comments about himself or about employee's bodies . . . ."

Cartwright's Twitter post said, "I've resigned from Lab Zero Games" and included a letter describing her reasons for resigning.  Because Cartwright's letter was a focus of Lab Zero's subsequent cross-complaint against plaintiffs, as well as plaintiffs' special motions to strike, we quote it at length.

Her letter stated that she had considered Zaimont a "close friend and coworker for 10 years" and that she had "tried to be as understanding as any friend could b[e]," but that "June was hard.

After the widely-criticized racist joke[7] and then the inappropriate DMs[8] and other stories, our team started speaking up. [¶] What we realized was that there was a pattern of behavior that I don't think we had fully understood until then. A pattern of hostility, insults, threats, lying, and harassment that many on our team had not openly shared with each other before." Cartwright claimed Zaimont did not "respect employees who don't work at all hours. He gets hostile and talks down to people. He makes jokes about firing people to their faces. He makes inappropriate jokes about his dick. He threatens and insults people and our partners, both directly and in public. He straight up lies, or misrepresents things he said earlier."

Cartwright's resignation letter also stated that she had "been subject to harassment by [Zaimont] too. I tolerated years of sexual comments about my body and clothes, uncomfortable jokes, unwanted hugs. He once suggested that I masturbate when I told him I couldn't sleep, and on another occasion suggested I 'help' him with his unfulfilled sexual needs. I made a complaint about him during my time at Reverge Labs[9] back in 2011. I did try to talk directly to him about how I was uncomfortable in 2017, and in return he called me a hypocrite and blamed me for how I dressed. He said he didn't want sexual

---

[7] Shortly after George Floyd's murder, Zaimont apparently remarked, "I can't breathe" during a live-streamed video game event.

[8] "DMs" appears to be a reference to "direct messages" between Zaimont and Bunny.

[9] Zaimont and Cartwright worked together at Reverge Labs prior to Lab Zero.

harassment training. If I wanted to keep my job, I felt like I had to just deal with it. [¶] And to be totally honest—if it was just me, I probably *would've* kept dealing with it. But I've learned that it's not just me. He's done this for years, to multiple people, and I can't continue protecting him by staying quiet about it anymore."

The resignations were followed by a public statement on August 24, 2020, from Autumn Games, which owned the intellectual property for Skullgirls, and Hidden Variable Studios, which developed a mobile version of the game, that they would no longer work with Zaimont or Lab Zero. Their statement noted that "a number of Lab Zero Games employees have decided to leave the company as a result of actions by Mike Zaimont and a series of reported incidents that involved [Zaimont] over the years," and, "find[ing] their allegations to be credible," declared that the companies "will no longer be working with Mike Zaimont or Lab Zero Games."

Then, on August 25, 2020, Zaimont announced that Lab Zero was "no longer able to continue operating at the previous capacity," and that "[r]emaining employees have been laid off . . . ."

Dozens of online articles covered the Lab Zero resignations and attendant controversy between August 24 and September 8, 2020.

## III. Lab Zero's cross-complaint

In April 2021, plaintiffs sued Lab Zero for retaliation and wrongful termination.

Lab Zero filed a first amended cross-complaint against plaintiffs the following month, alleging that plaintiffs falsely accused Zaimont of harassment with the aim of dismantling Lab

8

Zero and starting their own competing company. The cross-complaint included 11 causes of action, including the four causes of action at issue here: The eighth cause of action for intentional interference with contractual relations, the ninth cause of action for intentional interference with prospective economic relations, the tenth cause of action for defamation, and the eleventh cause of action for unfair business practices.

According to Lab Zero's cross-complaint, plaintiffs "facilitated written and oral conversations with Zaimont relating to sex, sexual orientation, urination, menstruation, porn, plastic surgery, body image, etc.," and had "solicited commentary from Zaimont in response to these topics." Then, "[i]n or around 2020, [plaintiffs] engaged in a scheme to characterize these conversations with Zaimont as harassment, unwelcomed behavior, and inappropriate behavior, and thus manipulate Zaimont into leaving Lab Zero, to force him out of Lab Zero, and/or to otherwise effectuate the dismantling of Lab Zero." The cross-complaint alleged that plaintiffs "falsely accused Zaimont of sexual harassment and made various public statements that Zaimont had sexually harassed them for years, when in fact" they had "initiated and welcomed discussions relating to sex" and related topics.

Lab Zero alleged that the purpose of "[plaintiffs'] scheme was to effectuate and further their ultimate plan to dismantle and destroy Lab Zero and start a new, competing company . . . ." Thus, the cross-complaint alleged that in early July 2020, "[Plaintiffs] exchanged messages with one another and other employees about forming a new company after they completed their plan to force Zaimont out of Lab Zero," including "discussions about taking over Lab Zero's current projects and

9

business interests with publishers, presenting themselves with positive publicity, and leaving Zaimont with all of Lab Zero's debt." For example, in July 2020 "Cartwright engaged in discussions with other employees on Lab Zero's Slack channel about starting a new company and whether Lab Zero's game engine was indeed proprietary." Around the same time, plaintiffs "discussed continuing to work with developer Hidden Variable on Skullgirls without Zaimont. These discussions were based on [plaintiffs] leaving Lab Zero and working on the game through their new, competing company, Future Club."

Additionally, Lab Zero alleged that in early July 2020 Cartwright had a conversation with Lab Zero's public relations firm, asking whether it was " 'completely out of the question to renegotiate the contract with a new entity' " started by plaintiffs. Plaintiffs also met with Focus, the publisher of Lab Zero's next game, without Zaimont present. Then, after the meeting plaintiffs falsely informed other employees "that Focus did not want [Zaimont] to stay at Lab Zero and would cancel the project if he continued to stay at" Lab Zero. In fact, "Focus was surprised to learn what [plaintiffs] had reported to Zaimont; and Focus had requested that Lab Zero not publicly announce anything about Zaimont's departure so that the companies could continue renegotiating the deal."

Plaintiffs' alleged scheme also included a "plan whereby they fostered negativity by other employees toward Zaimont with the intent of encouraging them to help dismantle and destroy the company." For example, plaintiffs "facilitated and engaged in conversations with other employees on Lab Zero's Slack channel and held team meetings without Zaimont, whereby they fostered employee discontent and unhappiness in the workplace."

10

Then, "[a]fter falsely accusing Zaimont of harassment and making public statements against him, [plaintiffs] destroyed Lab Zero's and Zaimont's public images, causing Lab Zero to break up and perish, as publishers cancelled their contracts with the company and the company was left no funds to pay its employees and continue its dealings." The cross-complaint alleged that Cartwright "resigned from her employment with Lab Zero, and immediately made false public statements and complaints against Zaimont."

In September 2020, plaintiffs announced the "existence of Future Club," describing the company on Twitter as " 'a new co-op game dev studio, formed by the team that brought you Skullgirls and Indivisible!' " According to the cross-complaint, since forming Future Club, "[plaintiffs] have been working with developer Hidden Variable on Skullgirls."

Based on these allegations, Lab Zero's eighth cause of action for intentional interference with contractual relations alleged that plaintiffs knew of Lab Zero's contracts with developers and publishers, including Hidden Variable and Focus, and "disrupted or prevented performance of the contracts" through their "scheme, devise [*sic*], and plan to dismantle and destroy Lab Zero and start a new competing company, namely, Future Club." The ninth cause of action for intentional interference with prospective economic relations similarly alleged that plaintiffs knew that Lab Zero was in an economic relationship with developers and publishers, including Hidden Variable and Focus, and "made defamatory statements to the public, publishers or developers working with Lab Zero, and/or Lab Zero's employees" about Zaimont "as a part of their scheme,

11

devise [*sic*], and plan to disrupt these economic relations" and "start[ ] a new, competing company, namely, Future Club."

Lab Zero's tenth cause of action for defamation claimed that plaintiffs "made false statements to the public, publishers or developers working with Lab Zero, and/or Lab Zero's employees about Zaimont," including that he had "sexually harassed them over many years and that [he] had created a hostile work environment," despite knowing such statements were false.

The eleventh cause of action for unfair business practices likewise alleged that plaintiffs engaged in "a scheme, devise [*sic*], and plan to dismantle and destroy Lab Zero and start a new, competing company," including making "false and deceiving representations to the public, publishers, and/or Lab Zero's employees" to encourage and solicit them to terminate their relationships with the company.

## IV.    Plaintiffs' anti-SLAPP motions

Plaintiffs filed separate special motions to strike pursuant to section 425.16.  Both plaintiffs contended that the eighth through eleventh causes of action in Lab Zero's cross-complaint arose, at least in part, from Cartwright's resignation letter posted on Twitter.  Plaintiffs further argued that Cartwright's resignation letter was posted in a public forum—Twitter—and was connected to a matter of public interest—"an ongoing debate over sexism in the gaming industry generally," and a "specific debate over Mr. Zaimont's conduct," which was "started by others more than a month before [Cartwright] made her statement." Plaintiffs' motions attached numerous online articles covering the public statements of Bunny and Grey, and the subsequent resignation letters from Lab Zero employees, including Cartwright, posted on Twitter.

12

Esquenazi also argued in her special motion to strike that any other purported defamatory statements about Zaimont's sexual harassment at issue in the cross-complaint—such as plaintiffs' statements to Lab Zero employees—were also protected, because they too concerned a matter of public interest.

Finally, plaintiffs argued that Lab Zero was unable to show a probability of prevailing on the merits of its causes of action.

## V. Lab Zero's opposition

Lab Zero opposed the motion. It argued that its eighth cause of action for intentional interference with contractual relations was not based on Cartwright's Twitter post, but instead plaintiffs' scheme to dismantle Lab Zero and start a competing company. Although it conceded that its eleventh cause of action for unfair business practices arose in part from Cartwright's Twitter post, it argued that the cause of action also arose from plaintifs' "scheme, devise [*sic*], and plan to dismantle and destroy" Lab Zero and start a new company, "which [did] not necessarily implicate the defamatory Tweet, but rather all of the events leading up to it."

Lab Zero did not dispute that Cartwright's Twitter post was the basis for its ninth cause of action for intentional interference with prospective economic relations and its tenth cause of action for defamation. Rather, it argued that the Twitter post did not concern a matter of public interest. According to Lab Zero, the purpose of Cartwright's post was "to justify to the public the departure of Lab Zero's employees from the company and to garner support from the public for the then-existing and later-effectuated plan to form a new company that did not include Zaimont."

13

It also argued that its evidence demonstrated it had a probability of prevailing on the four challenged causes of action.

Included with the opposition was a lengthy declaration from Zaimont. He claimed that plaintiffs "routinely facilitated" and participated in conversations with him regarding sex and related topics and gave him the impression that "no topic was off limits." Zaimont contended that following the public accusation by Bunny, plaintiffs "conspired/decided to characterize [their] past conversations as harassment and thus manipulate" him into leaving the company.

He further pointed to evidence which, according to him, showed that plaintiffs did not believe he had harassed anyone, and nonetheless decided to release a public statement characterizing his conduct as harassment. In particular, Zaimont identified Cartwright's resignation letter posted on Twitter, which he claimed was a "defamatory statement" which plaintiffs "worked together to draft . . . and conspired to release . . . upon [Cartwright's] resignation."

Zaimont also discussed plaintiffs' purported interference with Lab Zero's contracts and business prospects. He claimed that because of plaintiffs' communications with Focus, Focus refused to make a promised payment to Lab Zero and later terminated a binding deal memo related to the development of a new game. He also claimed that "following [Cartwright's] Twitter post, Autumn Games and Hidden Variables released an 'official statement' . . . end[ing] their relationship with Lab Zero," and that Future Club thereafter "took over the relationship" with those companies. According to Zaimont, Lab Zero's relationship with at least two other companies was also impaired as a result of the controversy and Lab Zero's subsequent closure.

14

## VI.    Plaintiffs' replies

In reply, plaintiffs emphasized several points.  First, they contended that even if Lab Zero's eighth cause of action was not based on Cartwright's Twitter post but instead " 'the events leading up to it,' " such "events" included plaintiffs' speech with other employees accusing Zaimont of sexual harassment. Plaintiffs argued that such speech, like Cartwright's Twitter post, was in connection with a public issue.  They further argued that even if some of the speech or conduct at issue in the cross-complaint was not connected to a public issue, they could still strike the allegations that did arise from such speech or conduct.

Plaintiffs also challenged Lab Zero's contention that Cartwright's Twitter post involved a mere private dispute, arguing that it was directly related to an ongoing public controversy over Zaimont's alleged sexual harassment.

Last, plaintiffs contended that Lab Zero could not show a probability of prevailing on the merits of its challenged causes of action.

## VII.    Trial court ruling

The trial court denied plaintiffs' special motions to strike as to all four challenged causes of action.  It held that Lab Zero's eighth and ninth causes of action for intentional interference with contractual relations and prospective economic relations, and eleventh cause of action for unfair business practices, did not arise from Cartwright's Twitter post.  The court noted that the pertinent question was not whether the causes of action "allege or mention a protected activity," but rather whether the causes of action "themselves, are based upon, and seek to hold [plaintiffs] liable, pursuant to and because of the protected activity."

15

The court concluded these causes of action did not arise out of Cartwright's Twitter post, but instead plaintiffs' alleged " 'scheme to dismantle Lab Zero so that they could redirect its business and affairs to the new, competing company that they intended to form, namely, Future Club.' " The court further held that to the extent Lab Zero's cross-complaint referred to Cartwright's Twitter post, that reference was "merely incidental or collateral to Lab Zero's cause of action—such an allegation is not the basis for the relief Lab Zero seeks and is instead offered as evidence of Cartwright and Esquenazi's purported scheme."

The trial court denied the motions to strike Lab Zero's tenth cause of action for defamation based on its determination that Cartwright's Twitter post was not connected to an issue of public interest. Although it agreed that "allegations of sexual harassment within an industry would be a topic of widespread public interest," it ruled that "the degree of connection between the resignation letter and the topic of sexual harassment to the public interest" was insufficient to warrant protection under section 425.16, subdivisions (e)(3) and (e)(4). The court stressed that the "alleged sexual harassment was done privately, within the workplace and, according to Cartwright and Esquenazi's theory, from Zaimont to various Lab Zero employees." It further emphasized that the content of Cartwright's letter "only generally touches on the issues of sexual harassment—to explain, in part, why Cartwright had chosen to leave Lab Zero—and is not closely enough linked with any ongoing public interest that might exist with respect to Zaimont." The court concluded that "[w]hatever its purported impact on the industry, the resignation letter does not contribute to the public conversation about a matter of public interest."

16

Cartwright and Esquenazi timely appealed.

## DISCUSSION

### I.     Applicable law and standard of review

"Enacted by the Legislature in 1992, the anti-SLAPP statute is designed to protect defendants from meritless lawsuits that might chill the exercise of their rights to speak and petition on matters of public concern.  (See § 425.16, subd. (a); *Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 619 [(*Rand*)]; *Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 192.)"  (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 883–884 (*Wilson*).)  To that end, section 425.16, subdivision (b)(1) provides:  "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."

An " 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes:  (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other

17

conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

The analysis of an anti-SLAPP motion involves two steps. "Initially, the moving defendant bears the burden of establishing that the challenged allegations or claims 'aris[e] from' protected activity in which the defendant has engaged." (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1061 (*Park*).) A claim arises from protected activity "when that activity underlies or forms the basis for the claim." (*Id.* at p. 1062.) Hence, "in ruling on an anti-SLAPP motion, courts should consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability." (*Id.* at p. 1063; see also *Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1015 (*Bonni*) ["[A] claim is subject to an anti-SLAPP motion to strike if its elements arise from protected activity."].) "In deciding whether the 'arising from' requirement is met, a court considers 'the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.' " (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 79, quoting section 425.16, subd. (b).)

Importantly, an anti-SLAPP motion can be brought in response to "a ' "mixed cause of action" '—that is, a cause of action that rests on allegations of multiple acts, some of which constitute protected activity and some of which do not." (*Bonni, supra,* 11 Cal.5th at p. 1010; see also *Baral v. Schnitt* (2016) 1 Cal.5th 376, 393 (*Baral*) ["an anti-SLAPP motion, like a conventional motion to strike, may be used to attack parts of a count as pleaded"].) In that event, "courts should analyze each

18

claim for relief—each act or set of acts supplying a basis for relief, of which there may be several in a single pleaded cause of action—to determine whether the acts are protected and, if so, whether the claim they give rise to has the requisite degree of merit to survive the motion." (*Bonni*, at p. 1010.) Thus, at the first stage of the anti-SLAPP analysis, a moving defendant "must identify the acts alleged in the complaint that it asserts are protected and what claims for relief are predicated on them. In turn, a court should examine whether those acts are protected and supply the basis for any claims. It does not matter that other unprotected acts may also have been alleged within what has been labeled a single cause of action; these are 'disregarded at this stage.' " (*Ibid*.) "So long as a 'court determines that relief is sought based on allegations arising from activity protected by the statute, the second step is reached' with respect to these claims." (*Ibid*.)

However, "[a]ssertions that are 'merely incidental' or 'collateral' are not subject to section 425.16." (*Baral, supra*, 1 Cal.5th at p. 394.) "Allegations of protected activity that merely provide context, without supporting a claim for recovery, cannot be stricken under the anti-SLAPP statute." (*Ibid*.)

If the defendant carries its burden to demonstrate that plaintiff's claims arise from protected activity, the plaintiff must then demonstrate its claims have at least " 'minimal merit.' " (*Wilson, supra*, 7 Cal.5th at p. 884.) To do so, "plaintiff must show the complaint is legally sufficient and ' " 'supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' . . ." ' " (*Taheri Law Group v. Evans* (2008) 160 Cal.App.4th 482, 488.)

19

An order granting or denying a special motion to strike is appealable. (§ 425.16, subd. (i); § 904.1, subd. (a)(13).) Our review is de novo. (*Park*, *supra*, 2 Cal.5th at p. 1067.)

## II. Parties' contentions

Plaintiffs contend that Lab Zero's eighth cause of action for intentional interference with contractual relations, ninth cause of action for intentional interference with prospective economic relations, tenth cause of action for defamation, and eleventh cause of action for unfair business practices arise, at least in part, from protected speech—i.e., Cartwright's Twitter post[10] and plaintiffs' alleged statements to coworkers accusing Zaimont of sexual harassment. Plaintiffs further contend that such speech was made in connection with a public issue, namely, an ongoing public controversy regarding Zaimont's alleged sexual harassment.

Lab Zero counters that the focus of its eighth, ninth, and eleventh causes of action is not Cartwright's Twitter post or plaintiffs' speech with coworkers regarding Zaimont's purported sexual harassment, but rather plaintiffs' scheme to dismantle Lab Zero and direct its business to their new company.[11] To the

---

[10] Although Cartwright posted the resignation letter on Twitter, as noted above, Zaimont claimed she and Esquenazi "worked together to draft this post and conspired to release it upon [Cartwright's] resignation." For purposes of this appeal, we therefore treat Cartwright's Twitter post as speech by both plaintiffs, not just Cartwright.

[11] Lab Zero does not dispute that plaintiffs' alleged speech accusing Zaimont of sexual harassment is the focus of its tenth cause of action for defamation.

extent such speech features in these causes of action, Lab Zero contends it is merely "collateral or incidental" to them or simply evidence of plaintiffs' scheme. Lab Zero further contends that plaintiffs' speech was not connected with a public issue, but instead concerned a private personnel dispute.

We first examine whether Lab Zero's eighth cause of action for intentional interference with contractual relations, ninth cause of action for intentional interference with prospective economic relations,[12] tenth cause of action for defamation, and eleventh cause of action for unfair business practices arise out of Cartwright's Twitter post and plaintiffs' alleged statements to coworkers accusing Zaimont of sexual harassment. We conclude that these causes of action do arise, at least in part, from such speech.

We therefore next examine whether such speech was in connection with a public issue, thus constituting protected activity under section 425.16, subdivisions (e)(3) or (e)(4). We conclude it was connected to a public issue, namely, an ongoing public controversy about Zaimont's alleged sexual harassment.

---

[12] Lab Zero titled its ninth cause of action "Intentional Interference with Prospective Economic Relations." We understand this cause of action to be identical to a cause of action commonly referred to as intentional interference with prospective economic advantage (see *Rand*, *supra*, 6 Cal.5th at pp. 628–629), and thus use the terms interchangeably.

III. **The four challenged causes of action arise, at least in part, from plaintiffs' alleged statements accusing Zaimont of sexual harassment**

A. **Eighth cause of action for intentional interference with contractual relations and ninth cause of action for intentional interference with prospective economic advantage**

"The elements which a plaintiff must plead to state the cause of action for intentional interference with contractual relations are (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." (*Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal. 3d 1118, 1126.) "The five elements for intentional interference with prospective economic advantage are: (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." (*Youst v. Longo* (1987) 43 Cal.3d 64, 71, fn. 6.)

As our Supreme Court has recognized, these "two intentional interference claims share many elements— principally, an intentional act by defendant designed to disrupt the relationship between plaintiff and a third party." (*Rand, supra*, 6 Cal.5th at p. 628.) We thus analyze these causes of

22

action together to determine whether Lab Zero alleged that plaintiffs' intentional acts designed to disrupt Lab Zero's relationships with third parties included Cartwright's Twitter post and plaintiffs' private speech with coworkers accusing Zaimont of sexual harassment. (See *id*. at pp. 629–630.) Based on our review of the record, we conclude that these causes of action arise, at least in part, from such speech.

As described above, in the summary of allegations at the outset of its cross-complaint Lab Zero alleged that plaintiffs "engaged in a scheme to characterize [prior conversations between plaintiffs and Zaimont] as harassment, unwelcomed behavior, and inappropriate behavior, and thus manipulated Zaimont into leaving Lab Zero, to force him out of Lab Zero, and/or to otherwise effectuate the dismantling of Lab Zero." The cross-complaint's summary further alleged that "[a]fter falsely accusing Zaimont of harassment and making public statements against him, [plaintiffs] destroyed Lab Zero's and Zaimont's public images, causing Lab Zero to break up and perish, as publishers cancelled their contracts with the company" and the company was forced to shutter. It thus seems clear that Lab Zero's cross-complaint characterized plaintiffs' allegedly false accusations of sexual harassment as intentional acts designed to interfere with Lab Zero's business relationships.

Moreover, the cross-complaint alleged that Cartwright's Twitter post was a specific intentional act designed to disrupt its business relationships. According to the cross-complaint, despite having initially welcomed Zaimont's conduct, plaintiffs later "falsely accused Zaimont of sexual harassment and made various public statements that Zaimont had sexually harassed them for years . . . ." The public statement highlighted by the cross-

23

complaint is Cartwright's Twitter post: The cross-complaint alleged that "on or around August 24, 2020, Cartwright resigned from her employment with Lab Zero, and immediately made false public statements and complaints against Zaimont." In turn, Zaimont's declaration in opposition to plaintiffs' special motions to strike described the alleged causal role Cartwright's Twitter post played in damaging Lab Zero's relationship with Autumn Games and Hidden Variables, and another potential business partner, Arc System Works.

The cross-complaint also alleges that plaintiffs' speech with coworkers accusing Zaimont of sexual harassment were some of the intentional acts designed to disrupt the company's relationships with third parties. Lab Zero's ninth cause of action for intentional interference with prospective economic advantage specifically alleged that plaintiffs "made defamatory statements to the public, publishers or developers working with Lab Zero, *and/or Lab Zero's employees about Zaimont . . . as part of their scheme . . . to disrupt these economic relations . . . .*" (Italics added.) The earlier allegations in the cross-complaint leave little doubt that these purportedly defamatory statements, a core feature of plaintiffs' alleged scheme, centered around plaintiffs' accusation that Zaimont had engaged in sexual harassment.[13]

---

[13] Our conclusion is buttressed by Lab Zero's recognition that this cause of action requires it to show that plaintiffs "engaged in an independently wrongful act—i.e., an act 'proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard.' " (*Reeves v. Hanlon* (2004) 33 Cal.4th 1140, 1145.) Lab Zero concedes that plaintiffs' defamation is the wrongful act in support of this cause of action.

Lab Zero emphasizes that unlike its ninth cause of action for intentional interference with prospective economic advantage, its eighth cause of action for intentional interference with contractual relations does not explicitly refer to plaintiffs' statements to the public or other employees about Zaimont's sexual harassment. Nevertheless, given the allegations in the rest of the cross-complaint, which Lab Zero incorporated by reference into this cause of action, we are hard-pressed to conclude plaintiffs' alleged statements about Zaimont's sexual harassment were *not* a principal part of the purported "scheme, devise [*sic*], and plan" to destroy Lab Zero encompassed by this cause of action too. That is especially so given that, as described already, the cross-complaint's summary of allegations described plaintiffs' false accusation about Zaimont's sexual harassment as an integral part of their scheme to dismantle Lab Zero, damage its business relationships, and divert its business to their new company. (See *Bonni*, *supra*, 11 Cal.5th at p. 1017 [concluding complaint's allegations regarding protected speech were not "window dressing" where "the complaint makes clear that [the plaintiff] intended them to have operative effect"].)

Relying largely on *Park*, Lab Zero argues that to the extent Cartwright's Twitter post figures implicitly in its eighth cause of action for intentional interference with contractual relations, or explicitly in its ninth cause of action for intentional interference with prospective economic advantage, it is simply evidence of plaintiffs' scheme to dismantle Lab Zero. In *Park*, *supra*, 2 Cal.5th at page 1060, the plaintiff, Park, sued his university employer alleging it denied him tenure because of his national origin. Among other things, Park's complaint alleged the "school dean 'made comments to Park and behaved in a manner that

25

reflected prejudice against him on the basis of his national origin' and that Park pursued an internal grievance, which was denied." (*Id*. at p. 1068.) The university filed a special motion to strike, arguing that Park's suit arose from its decision to deny Park tenure and its communications connected to that decision, which it contended were protected activities under the anti-SLAPP statute. (*Id*. at p. 1061.)

Our Supreme Court held that Park's discrimination cause of action was not subject to a special motion to strike because "[t]he elements of Park's claim . . . depend not on the grievance proceeding, any statements, or any specific evaluations of him in the tenure process, but only on the denial of tenure itself and whether the motive for that action was impermissible. The tenure decision may have been communicated orally or in writing, but that communication does not convert Park's suit to one arising from such speech. The dean's alleged comments may supply evidence of animus, but that does not convert the statements themselves into the basis for liability." (*Park, supra*, 2 Cal.5th at p. 1068.) As *Park* explained, "a claim may be struck only if the speech . . . *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted." (*Id*. at p. 1060.)

The California Supreme Court reached a different result in *Rand*. There, the plaintiffs' complaint alleged that the plaintiffs and the City of Carson agreed the plaintiffs would exclusively represent the city in negotiations with the National Football League over construction of a new stadium. (*Rand, supra*, 6 Cal.5th at p. 617.) According to the complaint, the city breached that agreement by allowing a different company, the Bloom defendants, to represent it in negotiations with the NFL. (*Id*. at

pp. 618–619.)  The complaint further alleged that the Bloom defendants engaged in intentional interference with contract and intentional interference with prospective economic advantage by secretly representing the city in negotiations with the NFL. (*Ibid*.)  Those two causes of action relied on the plaintiffs' contention that the Bloom defendants " 'act[ed] as the City's agent' by 'contacting NFL representatives' using [the plaintiffs'] promotional materials and company name," and met with the city and its mayor to " 'conspire about how to breach' " the city's agreement with the plaintiffs.  (*Id*. at p. 629.)  The trial court granted the Bloom defendants' special motion to strike these two causes of action.  (*Id*. at p. 619.)

On appeal, the California Supreme Court concluded that "[t]hese two courses of conduct are more than 'merely a reference to a category of evidence that plaintiffs have to prove their claims,' " and instead constituted the "conduct by which plaintiffs claim to have been injured in their intentional interference claims." (*Rand, supra*, 6 Cal.5th at p. 629.)  *Rand* emphasized that the Bloom defendants' secret communications with the city "*are* the interference now complained of" in the plaintiffs' complaint.  (*Ibid*.)

The present case resembles *Rand*, not *Park*.  As in *Rand*, and unlike in *Park*, plaintiffs' purported speech about Zaimont's sexual harassment *is* an alleged basis for their liability.  (See *Rand, supra*, 6 Cal.5th at p. 629.)  As illustrated above, Lab Zero's cross-complaint alleged that plaintiffs' false accusation about Zaimont's sexual harassment was a key facet of their scheme to disrupt the company's relationships with third parties, not just evidence of that scheme.  We thus reject Lab Zero's

27

contention that such speech is " 'merely incidental' or 'collateral' " to these causes of action. (See *Baral*, *supra*, 1 Cal.5th at 394.)

Nor do we find it determinative that, as Lab Zero emphasizes, plaintiffs' alleged scheme involved several acts in addition to plaintiffs' statements regarding Zaimont's sexual harassment, including "stealing trade secrets, poaching employees and third-parties, and starting a competing business." As explained earlier, a special motion to strike may be brought in response to a cause of action that "rests on allegations of multiple acts, some of which constitute protected activity and some of which do not." (*Bonni*, *supra*, 11 Cal.5th at pp. 1010–1012; *Baral*, *supra*, 1 Cal.5th at p. 393; *Area 51 Productions, Inc. v. City of Alameda* (2018) 20 Cal.App.5th 581, 599 ["Under the rule in *Baral*, we must disregard the unprotected conduct and focus on whether any nonincidental protected conduct is charged, even just in part."].) Thus, because an element of the eighth and ninth causes of action rests, at least in part, on plaintiffs' alleged speech accusing Zaimont of sexual harassment, that these causes of action involve other activity does not by itself defeat plaintiffs' anti-SLAPP motion.[14]

---

[14] For this same reason, we are not persuaded by Lab Zero's argument that there were causes other than Cartwright's Twitter post that allegedly led to the cancellation of Lab Zero's contracts with Focus and 505 Games. Again, plaintiffs need not demonstrate that every aspect of the eighth and ninth causes of action arises from protected activity; it is sufficient that some "nonincidental protected conduct is charged, even just in part." (*Area 51 Productions, Inc. v. City of Alameda*, *supra*, 20 Cal.App.5th at p. 599.)

28

## B.     Tenth cause of action for defamation

The parties do not dispute that Lab Zero's tenth cause of action for defamation arises from plaintiffs' alleged false accusation regarding Zaimont's sexual harassment.  As described earlier, that cause of action alleged that plaintiffs "made false statements to the public, publishers or developers working with Lab Zero, and/or Lab Zero's employees about Zaimont in his role as a shareholder, employee, and/or director of Lab Zero," including that plaintiffs "felt that Zaimont had sexually harassed them over many years and that Zaimont had created a hostile work environment," despite knowing and believing such statements were false.

## C.     Eleventh cause of action for unfair business practices

Lab Zero's eleventh cause of action for unfair business practices requires it to show " 'either an (1) "unlawful, unfair, or fraudulent business act or practice," or (2) "unfair, deceptive, untrue or misleading advertising." ' " (*Adhav v. Midway Rent A Car, Inc.* (2019) 37 Cal.App.5th 954, 970; see also *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180.)

It is not apparent from Lab Zero's cross-complaint or its brief on appeal whether it contends plaintiffs' alleged acts were unlawful, unfair, or fraudulent, or some combination of the three. But again, based on our review of Lab Zero's cross-complaint, the eleventh cause of action plainly arises, at least in part, from plaintiffs' speech activity, and in particular, their alleged statements regarding Zaimont's sexual harassment.

The eleventh cause of action alleged that plaintiffs "engaged in unfair business practices by engaging in a scheme, devise [*sic*], and plan to dismantle and destroy Lab Zero and start a new, competing company," and "*made false and deceiving representations to the public, publishers, and/or Lab Zero's employees* in an effort to solicit, induce, recruit, and encourage them to terminate their relationships" with Lab Zero. (Italics added.) The eleventh cause of action thus rests on the same "scheme" as the eighth and ninth causes of action, and features as a major component of plaintiffs' scheme their purported defamatory statements to the public and other employees. As we have concluded already based on our review of the cross-complaint, such statements concerned Zaimont's alleged sexual harassment.

Lab Zero admits that the eleventh cause of action "references the defamatory speech as a part of a series of conduct constituting unfair business practices or acts," but argues that such speech is "just further evidence of liability for unfair business practices and is therefore collateral or incidental" to the cause of action. We disagree. Given that plaintiffs' purportedly defamatory speech is one of the only concrete allegations supporting this cause of action, we cannot conclude it is merely "collateral or incidental" to the cause of action. To the contrary, the allegedly defamatory speech seems to be at the heart of the cause of action according to Lab Zero's pleading. (See *Bonni, supra*, 11 Cal.5th at p. 1017 [in analyzing whether cause of action arises from protected activity, "we will assume [the plaintiff's] complaint means what is says"].)

Furthermore, for the reasons addressed already, we are unpersuaded by Lab Zero that the cause of action does not arise

from plaintiffs' speech activity because "there are other wrongs complained of with respect to this cross-claim, i.e., all of the events leading up to and before the defamatory speech." Because plaintiffs' alleged speech pertaining to Zaimont's sexual harassment is a central part of Lab Zero's eleventh cause of action, the existence of other alleged unfair business practices is not consequential. (See *Bonni*, *supra*, 11 Cal.5th at p. 1010; *Baral*, *supra*, 1 Cal.5th at p. 393.)

## IV. Plaintiffs' alleged statements regarding Zaimont's sexual harassment were made in connection with a public issue

Having concluded that the eighth, ninth, tenth, and eleventh causes of action arise, at least in part, from plaintiffs' alleged speech accusing Zaimont of sexual harassment, we now address whether that speech is protected by section 425.16.

### A. Cartwright's Twitter post

Plaintiffs contend Cartwright's Twitter post was a "written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest" (§ 425.16, subd. (e)(3)), and thus was protected by section 425.16. We agree.

There appears to be no dispute that Cartwright's Twitter post was "made in a place open to the public or a public forum," thus satisfying the initial requirement of section 425.16, subdivision (e)(3). (See *Grenier v. Taylor* (2015) 234 Cal.App.4th 471, 481 ["Statements made on a Web site are made in a public forum."]; *Chaker v. Mateo* (2012) 209 Cal.App.4th 1138, 1146 [holding that the "Internet is a classic public forum"].) We thus

31

focus on whether Cartwright's Twitter post was "in connection with an issue of public interest." (§ 425.16, subd. (e)(3).)

"Section 425.16 does not define 'public interest,' but its preamble states that its provisions 'shall be construed broadly' to safeguard 'the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.' " (*Nygard, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1039 (*Nygard*), quoting section 425.16, subd. (a).) Despite the absence of a statutory definition, courts have concluded that speech on an issue of public interest can concern "a person or entity in the public eye [citations], conduct that could directly affect a large number of people beyond the direct participants [citations], or a topic of widespread, public interest [citations]." (*Rivero v. American Federation of State, County, and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913, 924 (*Rivero*); see *Rand*, *supra*, 6 Cal.5th at p. 621; *FilmOn*, *supra*, 7 Cal.5th at pp. 145–146.) As one court put it, " 'an issue of public interest' within the meaning of section 425.16, subdivision (e)(3) is *any issue in which the public is interested*. In other words, the issue need not be 'significant' to be protected by the anti-SLAPP statute—it is enough that it is one in which the public takes an interest." (*Nygard*, at p. 1042.)

By contrast, " 'a matter of concern to the speaker and a relatively small, specific audience is not a matter of public interest,' " and " '[a] person cannot turn otherwise private information into a matter of public interest simply by communicating it to a large number of people.' " (*Rand*, *supra*, 6 Cal.5th at p. 621.) Nor is a statement protected where it is "unconnected to any discussion, debate or controversy." (*Du*

*Charme v. International Brotherhood of Electrical Workers* (2003) 110 Cal.App.4th 107, 118 (*DuCharme*).)

Cartwright's Twitter post addressed both an issue and a person in the public eye.  Clearly, identifying and eliminating sexual harassment is a topic of general public interest.  (*Baughn v. Department of Forestry & Fire Protection* (2016) 246 Cal.App.4th 328, 339 ["[W]e do not doubt the public interest in preventing sexual harassment in the workplace"]; *Olaes v. Nationwide Mutual Ins. Co.* (2006) 135 Cal.App.4th 1501, 1511 ["public interest in the fair resolution of claims of sexual harassment is undeniable" and "the elimination of sexual harassment implicates a public interest"]).

More to the point, Zaimont's purported sexual harassment was of *particular* public interest following the public accusations by Bunny and Grey, which attracted media coverage and thus drew public attention to Zaimont's alleged conduct.  (See *Seelig v. Infinity Broadcasting Corp.* (2002) 97 Cal.App.4th 798, 807 [statements concerned public interest where they concerned "a television show of significant interest to the public and the media"]; *Tamkin v. CBS Broadcasting, Inc.* (2011) 193 Cal.App.4th 133, 143 [creation and broadcast of television show an issue of public interest "as shown by the posting of the casting synopses on various Web sites"]; compare *Rivero, supra*, 105 Cal.App.4th at p. 924 [statements not protected where they "concerned the supervision of a staff of eight custodians by Rivero, an individual who had previously received no public attention or media coverage"].)  Cartwright's resignation letter, which she posted on Twitter less than two months after the media coverage began and which described her own experience "tolerat[ing] years of sexual comments about [her] body and

33

clothes, uncomfortable jokes, [and] unwanted hugs" by Zaimont, was thus specifically connected to an ongoing controversy.[15] (See *Nygard, supra,* 159 Cal.App.4th at p. 1042; *Seelig v. Infinity Broadcasting Corp., supra,* 97 Cal.App.4th at pp. 807–808; compare *DuCharme, supra,* 110 Cal.App.4th at p. 118 [Web site posting regarding removal of union officer was not matter of public interest where it was "unconnected to any discussion, debate, or controversy"].) The connection between the ongoing controversy and Cartwright's Twitter post is further evidenced by the significant media coverage that followed her and her colleagues' Twitter posts announcing their resignations.

Plaintiffs and Lab Zero both argue that *FilmOn* favors their respective positions. We find *FilmOn* favors plaintiffs here. In *FilmOn,* our Supreme Court considered how to determine whether a statement is protected by section 425.16, subdivision (e)(4), the so-called "catchall provision," which concerns " 'conduct in furtherance of' " free speech " 'in connection with a public issue or an issue of public interest.' "[16] (*FilmOn.com, supra,* 7 Cal.5th

---

[15]    We are not convinced by Lab Zero's contention that because Cartwright's resignation letter was not focused exclusively on Zaimont's sexual harassment, it did not concern a matter of public interest. To be sure, Cartwright's letter described a range of objectionable conduct by Zaimont in addition to describing his sexual harassment. In our view, that does not lessen the connection between Cartwright's resignation letter and the ongoing controversy about Zaimont's alleged sexual harassment.

[16]    Although *FilmOn* addressed subdivision (e)(4) of section 425.16, we agree with the parties that its analysis is also relevant to determining whether a statement concerns "an issue of public

at pp. 139–140.) *FilmOn* instructed that courts should first ask "what 'public issue or . . . issue of public interest' the speech in question implicates—a question we answer by looking to the content of the speech. [Citation.] Second, we ask what functional relationship exists between the speech and the public conversation about some matter of public interest." (*Id.* at pp. 149–150.) *FilmOn* emphasized that it is not enough that a statement " 'refer to a subject of widespread public interest; the statement must in some manner itself contribute to the public debate.' " (*Id.* at p. 150.) In examining that issue, a court must consider "context—including audience, speaker, and purpose." (*Id.* at pp. 151–152.)

At issue in *FilmOn* were the confidential reports of the defendant, a for-profit business which tracked information about the Web sites on which its clients advertised. (*FilmOn*, *supra*, 7 Cal.5th at pp. 140–141.) The plaintiff alleged that the defendant had disparaged its digital distribution network by falsely classifying the plaintiff's Web sites under the categories of " 'Copyright Infringement File-Sharing' and 'Adult Content.' " (*Id.* at pp. 141–142.) Even acknowledging that the general topics at issue, including "sexually explicit media content," "seem[ed] to qualify as issues of public interest" under section 425.16, subdivision (e)(4), *FilmOn* concluded that the defendant's confidential reports did not further "the public conversation on an issue of public interest." (*FilmOn*, at pp. 152–153.) It stressed that the defendant "issues its reports not to the wider public— who may well be interested in whether [the plaintiff] hosts

_____

interest" under subdivision (e)(3). (See *Bernstein v. LaBeouf* (2019) 43 Cal.App.5th 15, 22, fn. 4 (*Bernstein*).)

content unsuitable for children or whether its streaming platform infringes copyright—but privately, to a coterie of paying clients. Those clients, in turn, use the information [the defendant] provides for their business purposes alone. The information never entered the public sphere, and the parties never intended it to." (*Id*. at p. 153.)

Here, however, Cartwright's resignation letter *was* directed to the public: She broadcast it widely by posting it on Twitter rather than privately submitting it to Lab Zero. By doing so, she placed her own experiences with Zaimont in the context of the ongoing public controversy that had been initiated months earlier by Bunny and Grey. We thus have little trouble concluding her statement was connected to an issue of public interest, which was only amplified by the media coverage following her and her colleagues' public resignations.

For these same reasons, we are not persuaded by Lab Zero's attempt to compare this case to our decision in *Bernstein*. There the statements of the celebrity defendant calling a bartender a "racist" "were not directed at someone in the public eye," and "[n]othing in the record suggest[ed] that, prior to this incident, [the plaintiff] was a public figure or had been involved in any issue of public interest." (*Bernstein*, *supra*, 43 Cal.App.5th at pp. 23–24.) *Bernstein* also found "no evidence that [the defendant's] comments addressed an ongoing controversy or an issue that had garnered any public interest before [the defendant] lashed out at [the plaintiff]." (*Id*. at p. 24.) Here, however, Zaimont's purported sexual harassment was already the subject of media coverage before Cartwright's Twitter post. Also, Cartwright's Twitter post was directly connected to that

ongoing controversy by describing how she had "been subject to harassment by [Zaimont] too."

Finally, Lab Zero challenges Cartwright's motive for posting her resignation letter on Twitter. It argues that she did not want to address a matter of public concern; she instead wanted "to justify to the public the departure of Lab Zero's employees from the company and to garner support from the public for" plaintiffs' scheme to form a new company. But Cartwright's motive is not relevant at the first step of the analysis under section 425.16. (See *Wilson*, *supra*, 7 Cal.5th at p. 888 ["[A]t the first step of the anti-SLAPP analysis, we routinely have examined the conduct of defendants without relying on whatever improper motive the plaintiff alleged."]; *Ojjeh v. Brown* (2019) 43 Cal.App.5th 1027, 1038 ["[O]ur task at the first stage of the anti-SLAPP analysis is to examine the challenged conduct without regard to the allegations of improper motive."].) Hence, that Lab Zero points to evidence suggesting Cartwright publicized her resignation letter on Twitter to further plaintiffs' purported scheme, not to further the public debate over Zaimont's conduct, does not factor into our conclusion that the speech concerns an issue of public interest.

## B.    Plaintiffs' statements to coworkers

Plaintiffs argue that their alleged statements to coworkers about Zaimont's sexual harassment constituted "conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest" (§ 425.16, subd. (e)(4)), and thus also are protected by section 425.16. Before we address that issue, we examine Lab Zero's preliminary arguments.

37

### i. Preliminary issues

Lab Zero first contends that Cartwright failed to identify her speech with coworkers accusing Zaimont of sexual harassment as a category of protected speech in her special motion to strike, and thus forfeited the argument.

We conclude this issue was adequately raised in the trial court and thus was not forfeited. As Lab Zero acknowledges, Esquenazi's special motion to strike addressed plaintiffs' alleged private speech to coworkers, urging that the speech was protected under the anti-SLAPP statute because "[s]ection 425.16 protects 'even private communications, so long as they concern a public issue.' " In particular, Esquenazi contended that "allegations of harassment by Mr. Zaimont were issues of public interest in the summer and fall of 2020 and thus any private statements by . . . Esquenazi *or Cartwright* about those issues are protected by Section 425.16." (Italics added.)

Further, both plaintiffs' reply briefs filed in the trial court argued that their alleged private speech to coworkers about Zaimont's harassment was protected. They raised this argument in response to Lab Zero's contention that its cause of action for intentional interference with contractual relations did not concern Cartwright's Twitter post, but instead the "events leading up to it."

Finally, at the hearing on their motions plaintiffs pointed out that the scheme described in Lab Zero's cross-complaint included their allegedly defamatory statements to coworkers about Zaimont.[17]

---

[17] Plaintiffs' counsel argued as follows: "Again, if you look at the opposition and if you look at the evidence submitted in the

38

Accordingly, because we find that this issue was adequately raised in the trial court, we are not persuaded that Cartwright forfeited it.

Next, Lab Zero argues that plaintiffs' alleged statements to coworkers regarding Zaimont's sexual harassment are not described with sufficient particularity to warrant anti-SLAPP protection. To the extent plaintiffs' precise statements to coworkers are not identified in Lab Zero's cross-complaint or its opposition to plaintiffs' motions to strike, we hesitate to blame *plaintiffs* for that. It was Lab Zero's obligation to plead the exact defamatory statements at issue. (See *Hecimovich v. Encinal School Parent Teacher Organization* (2012) 203 Cal.App.4th 450, 457, fn. 1 [" 'It is sometimes said to be a requirement, and it certainly is the common practice, to plead the exact words . . . or other defamatory matter.' "].) Lab Zero thus should not be allowed to take advantage of that same vagueness as a reason to defeat plaintiffs' motions.

In any event, we find that plaintiffs' alleged statements with coworkers are sufficiently identified for purposes of our anti-SLAPP analysis. The summary of allegations in the cross-

---

opposition and if you look at the complaint, it's clear that the scheme that is alleged here is based on the protected speech act. [¶] Specifically *the scheme is the encouragement of the employees* and defamatory statements allegedly made by my clients that caused the collapse of this company. So the scheme is itself based on speech act. Again, you have to look at the conduct that is the basis of the acts here. And as the complaint is clear, the conduct is that cross-defendants made defamatory statements to the public, publishers, or developers working with Lab Zero *and/or Lab Zero's employees about Zaimont*." (Italics added.)

39

complaint alleged that plaintiffs "engaged in a scheme to characterize [their] conversations with Zaimont as harassment, unwelcomed behavior, and inappropriate behavior," in furtherance of their objective to dismantle Lab Zero. The ninth, tenth, and eleventh causes of action all alleged that plaintiffs made "false" and "defamatory" statements about Zaimont to Lab Zero employees. And the tenth cause of action for defamation makes clear that those false and defamatory statements were that "Zaimont had sexually harassed [plaintiffs] over many years and that Zaimont had created a hostile work environment." Notably, on appeal Lab Zero makes no effort to explain what such defamatory statements were if *not* plaintiffs' accusation that Zaimont had engaged in sexual harassment.

We thus conclude the cross-complaint adequately identifies plaintiffs' speech with coworkers for purposes of our analysis and proceed to examine whether such statements were protected by section 425.16.

### ii. Plaintiffs' statements to coworkers were protected by section 425.16

We conclude that plaintiffs' alleged private statements to coworkers accusing Zaimont of sexual harassment constituted "conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest" (§ 425.16, subd. (e)(4)), and thus were protected by section 425.16.

We begin by observing that "subdivision (e)(4) does not require a public forum" and "applies to private communications concerning issues of public interest." (*Terry v. Davis Community Church* (2005) 131 Cal.App.4th 1534, 1545–1546 (*Terry*) [affirming special motion to strike causes of action arising from

40

church report accusing youth group leaders of inappropriate relationship with minor]; see *FilmOn, supra*, 7 Cal.5th at p. 146 [noting that "[l]ong before *Terry* . . . we held that section 425.16 may protect private events and conversations"].)  Thus, that plaintiffs' alleged statements to coworkers were private does not undermine application of section 425.16, subdivision (e)(4) here.

As *FilmOn* instructs, our first task in evaluating whether speech is protected by subdivision (e)(4) is to "ask what 'public issue or . . . issue of public interest' the speech in question implicates—a question we answer by looking to the content of the speech." (*FilmOn, supra*, 7 Cal.5th at p. 149.)  We have already concluded that Zaimont's purported sexual harassment was an issue of public interest following the publicized accusations of Bunny and Grey.  Plaintiffs' alleged private statements to coworkers accusing Zaimont of similar conduct thus concerned an issue of public interest.

"Second, we ask what functional relationship exists between the speech and the public conversation about some matter of public interest.  It is at the latter stage that context proves useful." (*FilmOn, supra*, 7 Cal.5th at pp. 149–150.)  "[T]he catchall provision demands 'some degree of closeness' between the challenged statement[ ] and the asserted public interest," and, as noted already, " 'the statement must in some manner itself contribute to the public debate.' " (*Id*. at p. 150.)  Our "inquiry does not turn on a normative evaluation of the substance of the speech.  We are not concerned with the social utility of the speech at issue, or the degree to which it propelled the conversation in any particular direction; rather, we examine whether a defendant—through public or private speech or

41

conduct—participated in, or furthered, the discourse that makes an issue one of public interest." (*Id*. at p. 151.)

Applying the framework from *FilmOn*, we find a close connection between plaintiffs' alleged private statements accusing Zaimont of sexual harassment and the public interest in his alleged harassment. (See *FilmOn, supra*, 7 Cal.5th at p. 150.) According to Zaimont's declaration in opposition to plaintiffs' special motions to strike, plaintiffs' statements to coworkers accusing him of sexual harassment occurred in the period directly after media coverage publicized the similar accusations of Bunny and Grey. Additionally, the public resignation letters of Lab Zero employees indicated that it was partly the accusations of Bunny and Grey that spurred employees to begin discussing with one another their own experiences with Zaimont's sexual harassment.

We also find that plaintiffs' alleged private statements to coworkers accusing Zaimont of sexual harassment "furthered[ ] the discourse that makes an issue one of public interest." (*FilmOn, supra*, 7 Cal.5th at 151.) Plaintiffs' alleged private accusations were followed by the public resignation letters of Cartwright and her two colleagues, which, in turn, continued the ongoing media coverage and controversy over Zaimont's purported harassment. And, importantly, Cartwright and her colleagues emphasized in their public resignation letters the role the earlier private communications among coworkers played in their decisions. Because plaintiffs' alleged private statements were a catalyst for subsequent, similar speech in a public forum, we conclude the private statements constituted "conduct in furtherance" of "free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4); see *Tamkin v.*

42

*CBS Broadcasting, Inc.*, *supra*, 193 Cal.App.4th at p. 143 ["An act is in furtherance of the right of free speech if the act helps to advance that right or assists in the exercise of that right."]; *Lieberman v. KCOP Television, Inc.* (2003) 110 Cal.App.4th 156, 166 [defining "furtherance" in § 425.16, subd. (e)(4) as "*helping* to advance, *assisting*"].)

## V.    Remand

Plaintiffs make no serious effort to address the second step of the anti-SLAPP analysis, and instead refer us to their motions in the trial court. We therefore do not reach the second step. (See *Colores v. Board of Trustees* (2003) 105 Cal.App.4th 1293, 1301, fn. 2 ["[I]t is not appropriate to incorporate by reference, into a brief, points and authorities contained in trial court papers, even if such papers are made a part of the appellate record."].) We further note that Lab Zero has requested that we remand this matter to the trial court to analyze step two in the event we conclude plaintiffs have satisfied their burden at step one. We thus conclude it is appropriate to remand this matter to the trial court to determine whether Lab Zero can demonstrate its claims "have at least 'minimal merit.' " (*Wilson*, *supra*, 7 Cal.5th at p. 884.)

To assist on remand, we reiterate our Supreme Court's direction regarding how to address a case involving so-called "mixed" causes of action: "[C]ourts should analyze each claim for relief—each act or set of acts supplying a basis for relief, of which there may be several in a single pleaded cause of action—to determine whether the acts are protected, and, if so, whether the claim they give rise to has the requisite degree of merit to survive the motion." (*Bonni*, *supra*, 11 Cal.5th at p. 1010.) At step two, Lab Zero has the burden "to demonstrate that each challenged

claim based on protected activity is legally sufficient and factually substantiated. The court, without resolving evidentiary conflicts, must determine whether [Lab Zero's] showing, if accepted by the trier of fact, would be sufficient to sustain a favorable judgment. If not, the claim is stricken. Allegations of protected activity supporting the stricken claim are eliminated from the complaint, unless they also support a distinct claim on which the plaintiff has shown a probability of prevailing." (*Baral, supra*, 1 Cal.5th at p. 396.)

## DISPOSITION

The order denying plaintiffs' special motions to strike pursuant to section 425.16 is reversed. The matter is remanded to the trial court for further proceedings consistent with this decision. Plaintiffs shall recover their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

LAVIN, J.

EGERTON, J.

45